FILED

JUL 2 4 2018

Clerk, U.S. District Court
District Of Montana
Missoula

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MONTANA
GREAT FALLS DIVISION

| | |
|---|---|
| RODNEY THOMAS DUBOIS, | Cause No. CV 17-25-DLC-JTJ |
| Petitioner, | |
| vs. | FINDINGS AND RECOMMENDATIONS OF UNITED STATES MAGISTRATE JUDGE |
| LORAINE WODNIK, INTERIM DIRECTOR MONTANA DEPARTMENT OF CORRECTIONS; STEVEN JOHNSON, WARDEN, AN AGENT FOR MONTANA DEPARTMENT OF CORRECTIONS; AND THE ATTORNEY GENERAL OF THE STATE OF MONTANA, | |
| Respondents. | |

On March 20, 2017, Rodney Dubois, through counsel, filed his petition for a writ of habeas corpus pursuant to 28 U.S.C. § 2254. (Doc. 1.) The State timely filed an Answer to Mr. Dubois' petition; Mr. Dubois replied. (Docs. 10 & 12.) Having reviewed the briefs and supporting documents of both parties, and as explained below, Mr. Dubois' petition should be denied.

## I.    Background

Following a 10-day trial in Montana's Eighth Judicial District, Cascade County, a jury found DuBois guilty of Deliberate Homicide. (Doc. 10-13 at 4.) On May 26, 2004, DuBois was sentenced to life in prison without the possibility of parole. (Doc. 10-15 at 5.)

1

## A. Trial Court Proceedings

The parties both agree that the claims Dubois seeks to raise in the instant petition were raised on direct appeal. *See*, (Doc. 12 at 2.)  Accordingly, the Court will adopt the facts as summarized by the Montana Supreme Court in their direct appeal opinion affirming Dubois' conviction:

> The events leading to this appeal occurred on March 15, 2003.  Dubois chose to testify at his trial.  According to Dubois, he went to the home of Dion Guckeen (Guckeen) with his friend Herman Belgarde (Belgarde) to procure methamphetamine.  While Belgarde was in another room, Guckeen told Dubois that he was a paranoid schizophrenic and could get away with killing Dubois.  Dubois went into the other room and related these statements to Belgarde.  Belgarde told Dubois not to worry and gave him a small baseball bat.  When Dubois and Belgarde left the room, they found Guckeen holding a gun.  Belgarde took the gun from Guckeen, removed all the bullets except one, and gave the gun back to Guckeen.  Dubois left Guckeen's house and eventually got a ride back to his home from a local resident, to whom Dubois gave the bat.

> Dubos said that Belgarde then called him, telling him to come back to Guckeen's house because methamphetamine was available there, and that he could safely return.  Dubois said he tried to drive to Guckeen's house but got lost, and Belgarde sent friends to pick him up.  Dubois took a large flashlight with him for defense.  When Dubois arrived, there was no methamphetamine.  Guckeen accused Dubois of sleeping with his girlfriend, which Dubois denied.  Dubois then said that Guckeen pulled a gun from under a cushion he was sitting on.  Dubois grabbed another baseball bat and left Guckeen's house with Belgarde, Linda Scott (Scott), and Misty Palmerton (Palmerton).

> Dubois went on to say that, after dropping off Belgarde, he stayed with Scott and Palmerton, who promised they were going to go party.  The three went back to Guckeen's house, where Dubois felt a tense atmosphere.  Guckeen kept looking at Dubois and then at the cushion where the gun had previously been.  Guckeen then reached under that same cushion, and Dubois, thinking Guckeen was reaching for the gun he had seen earlier, hit him in the head

2

with the baseball bat. Dubois did not think the first hit had done anything to Guckeen, so he hit Guckeen twice more in the head. Dubois thus claimed that he acted in self-defense.

According to Dubois, another man in the room, Tony Sambenedetto (Sambenedetto), appeared to be reaching for another bat, and Dubois told him not to. Sambenedetto then left. Dubois did not admit hitting Sambenedetto with the bat.

Dubois said Scott told him to call 911, which required him to leave the house. Palmerton went with Dubois, who took the bat. When they returned to the house, Palmerton suggested that they all lie to the police and say that they found Guckeen already injured, and she said she would tell Scott what to tell the police. Dubois initially lied to the police about what happened, saying that he found the bat and held it in safekeeping for the authorities. After Dubois learned that Palmerton and Scott had told the police what actually happened, he explained why he hit Guckeen with the bat.

The State's witnesses contradicted many parts of Dubois' story. According to Scott, she had been at the house earlier in the day when Guckeen, Dubois, Belgarde, and Sambenedetto were all present, and they appeared to be just sitting around talking. When Scott returned later with Palmerton, she heard neither arguing nor an exchange of bad words.

Palmerton said she saw Dubois hit Guckeen in the head with the bat, and she yelled at Dubois as he walked away. Dubois then turned and headed back toward Guckeen. Palmerton jumped in front of Dubois, but he threw her into the wall and hit Guckeen in the head again. Palmerton then saw Dubois approach Sambenedetto, who put his arms up for protection. Dubois swung the bat at Sambenedetto's arms and told him to leave. According to Palmerton, Dubois told her to lie and say they found the baseball bat in the driveway. However, after the police put Palmerton and Scott in a car away from Dubois, Palmerton explained how Dubois had attacked Guckeen.

Sambenedetto testified that Dubois hit him with the bat.

According to Palmerton, Scott, and Sambenedetto, Guckeen did not have a gun on March 15, 2003, and none of them heard Guckeen threaten Dubois or argue with him. A friend of Guckeen's, Tiffany Cook, also said Guckeen did not have a gun that day, and she had never seen a gun at Guckeen's

house.  No gun was found in the house.

Dr. Glenn Winslow (Dr. Winslow), a trauma surgeon, and Dr. Karen Fagin
(Dr. Fagin), a neurosurgeon, treated Guckeen at Benefis Hospital.  Guckeen
was comatose and completely unresponsive.  His breathing was alternately
rapid and slow, which implied damage to the brain stem as well as to the
brain itself.  Guckeen exhibited limited brainstem function.  Guckeen's
treatment included intubation in order to force rapid breathing in an attempt
to ease the pressure inside his head, as well as morphine to both ease
pressure and alleviate pain.  The amount of morphine administered to
Guckeen was increased slowly during his time at the hospital.

Guckeen's family did not want extraordinary measures taken to keep him
alive after being told he would likely never be aware again.  Eventually, his
breathing tube was removed because he could breathe on his own.  Guckeen
died on March 17, 2003.

Dr. Fagin explained that she had never seen skull fractures as bad as those
suffered by Guckeen.  She described Guckeen's brain as pulped, and opined
that the swelling was putting pressure on the brainstem.  According to Dr.
Fagin, barring a miracle, Guckeen would not have survived no matter what
surgery was done.

Dr. Fagin's opinion was that Guckeen died of traumatic brain injury, and
neither morphine nor extubation contributed to his death.

Dr. Winslow's opinion was that Guckeen died of a blunt trauma to the head
resulting in a closed head injury, with no contribution from morphine or
extubation.

Dr. Gary Dale, the State Medical Examiner, testified he could not give an
opinion what caused Guckeen's death to a high degree of certainty.  He did,
however, state that it was his opinion that preexisting conditions did not
contribute to Guckeen's death.  His opinion was that, more likely than not,
an increased dose of morphine caused Guckeen's death.  However, in his
report he listed the cause of Guckeen's death as unknown.

Dr. Daniel Spitz (Dr. Spitz), a forensic pathologist, testified for the defense.
After reviewing Guckeen's medical records, he gave the opinion that
Guckeen died of respiratory failure cause by injuries to the brain and skull,

morphine intoxication and extubation.  In Dr. Spitz's opinion, Guckeen was never brain dead, and breathing on his own for over a day suggested his brain stem was relatively intact.  Dr. Spitz stated he could not comment on whether Guckeen's treatment ended too early, as a proper brain-death protocol was not performed.  He stated he was unable to determine what chance Guckeen had to survive his injuries.  He did agree that the injuries were severe enough to possibly cause death regardless of treatment, and that the proximate cause of death was blunt head trauma, which indicated the sequence of events leading to Guckeen's death.

Dubois was charged by an amended information with Deliberate Homicide in violation of 45-5-102(1), MCA.  He pled not guilty and trial by jury commenced on January 26, 2004.

Dubois objected to the District Court's instruction no. 12.  This instruction provided that the element of purpose or knowledge necessary to convict Dubois of deliberate homicide could be established even if Dubois did not contemplate that his blows with the baseball bat would kill Guckeen, if the result involved the same kind of injury that was contemplated.

Dubois' trial counsel did not offer an instruction on whether his actions were the proximate cause of Guckeen's death.  Appellate counsel claims this omission was both plain error and ineffective assistance of counsel.

One Vicki Algeo (Algeo) testified for the defense at trial.  The prosecutor, by use of a leading question on re-cross examination, elicited from this witness that she felt Dubois was a gangster.  Dubois moved for a mistrial on this ground, which motion was denied.

During closing argument, Deputy County Attorney Mary Ann Ries (Ries) characterized one of Dubois' statements as a lie.  Dubios also moved for a mistrial on this ground, which motion was denied.

The jury found Dubois guilty of deliberate homicide.

*State v. DuBois*, 2006 MT 89, ¶¶ 8-23, 25-29; 332 Mont. 44; 134 P. 3d 82 (Mont.

2006).

### B. Direct Appeal

On appeal, DuBois argued: (1) the trial court erred in instructing the jury on the requisite mental state for deliberate homicide; (2) the trial court erred in failing to *sua sponte* give a specific instruction on proximate cause; (3) trial counsel was ineffective for failing to offer an instruction on proximate cause; (4) the trial court erred by failing to grant the defense's motion for a mistrial based upon the prosecutor describing DuBois as "a gangster" during cross-examination; and (5) the trial court erred in failing to grant a mistrial based upon the prosecutor referencing a statement made by DuBois as "a lie" during closing argument. *DuBois*, 2006 MT 89, ¶¶ 2-7.

In relation to his first claim, Dubois argued the trial court effectively hamstrung his defense by giving jury instruction no. 12, but the Court noted the instruction was taken from Mont. Code Ann. § 45-2-201(2)(b). *Id.* at ¶ 36. The Court explained that by statute, the mental state for deliberate homicide can be established if the end result "involves the same or similar kind of harm or injury as that which is contemplated by the defendant, even if the degree of injury actually caused was not contemplated by the defendant." *DuBois*, 2006 MT 89, ¶ 37, *citing State v. Clausell*, 2001 MT 62, ¶ 41. The Court held the instruction, as given, did not prevent the jury from acquitting Dubois of deliberate homicide, if they were to believe Guckeen died from the morphine administration, rather than the blows to

6

his head.

The Court also observed the jury could have determined the actual result of Dubois' actions, Guckeen's death, was too remote or accidental in relation to Dubois' liability. If the jury made such a determination, they would have had the ability to acquit Dubois of the deliberate homicide. *Id.* at ¶ 38. The Court noted that trial counsel for Dubois argued that perhaps aggravated assault was a more appropriate conviction, because the defense believed and argued strenuously that Guckeen died from the morphine administration and not from as a result of the injuries he sustained. *Id.* Because the instruction, as given, was a correct statement of the law and was applicable to the facts, the Court held Dubois was not prevented from raising reasonable doubt based upon the defense's theory of morphine intoxication. *Id.* at ¶ 39.

Dubois next urged the Court to exercise plain error review and find that the trial court's failure to offer its own instruction on proximate cause left the jury without the means to make a finding central to the defense's theory of the case. The Court went back to its rationale regarding instruction no. 12, noting that it correctly set forth the applicable Montana law. *Id.* at ¶¶ 42-43. The Court also noted the jury received instruction no. 10 which set out the elements of deliberate homicide, one of which being that Dubois caused Guckeen's death. *Id.* at ¶ 44. The Court determined the jury was fully and fairly instructed. Further, the Court

7

held the lack of a specific proximate cause instruction did not merit plain error review because, there was no resulting manifest miscarriage of justice, there was no question of fundamental fairness left unsettled, and the integrity of the judicial process was not compromised. Accordingly, the Court declined to review the claim. *Id.* at ¶ 45.

Relative to Dubois' claim of ineffective assistance of trial counsel for failing to offer an instruction on proximate cause, the Court found that Dubois could not satisfy the prejudice prong of the *Strickland* test,[1] because a proximate cause instruction was not required for Dubois to have a fair trial. Accordingly, Dubois failed to establish his counsel was ineffective for failing to offer such and instruction. *Id.* at ¶ 49.

In relation to Dubois fourth claim, the Court referenced the following exchange that took place on re-cross examination between Algeo and the prosecutor:

Q:   And when you and Tony were having this conversation, you were trying to figure out why it happened; is that fair to say?

A:   Yes.

Q:   You were trying to figure out why Rodney would beat your good friend, Dion; is that right?

A:   Yes.

---

[1]The test to analyze the effectiveness of counsel under, *Strickland v. Washington*, 466 U.S. 668 (1984), is set forth in the order below.

Q:     And you told the detectives that Dion would never threaten, especially- Dion would never threaten his type, referring to Rodney?

A:     Yes.

Q:     And you explained that Rodney is like a gangster, and Dion would never threaten him; is that right?

A:     Uh-huh.

Q:     Detective Phillips asked you if Dion was that aggressive, do you recall that?

A:     Uh-huh.

Q:     And you said Dion's not that stupid.

A:     Yes.

Q:     And you explained to the detective that Dion's scared to death, you know, he's not a fighter.  He doesn't like fights.

A:     Right.

Q:     Is that accurate? Is that how Dion was?

A:     Yes.

*Id.* at ¶ 51.  Following the reference to Dubois being a gangster, the defense moved for a mistrial.  The Court denied the motion but offered to give a curative instruction.[2]

---

[2] Despite the trial court's offer, the defense did not request a curative instruction.  (Doc. 10-10 at 189: 19-20).

9

Dubois contended that this inflammatory and prejudicial characterization contributed to his conviction, violated the rules of evidence, and undermined his self-defense theory. Dubois posited that the term "gangster" may have caused jurors to punish him despite favorable evidence. *Id.* at ¶ 53. The Court noted that it was Algeo that used the term "gangster" in her initial statement to the police and that the State, therefore, could properly question her about it. *Id.* at ¶ 54. Further, the Court held that in light of all the evidence presented at trial, the term would be unlikely to cause the jury to punish Dubois, even in the event he was proven not guilty. The Court held there was no abuse of discretion when the trial court denied Dubois' motion for a mistrial. *Id.* at ¶¶ 54-55.

In Dubois' final claim, he contended a mistrial was warranted when the prosecutor made the following reference to a statement of Dubois in her closing argument:

> And [Deputy] Van Dyken asked, he says, does it have to do with dope? And [Dubois] says, I can't say. Why can't he say? Because it's a lie.

*Id.* at ¶ 57. The trial court agreed the statement was improper, but denied the motion for a mistrial. Instead, the following instruction was given to the jury:

> The Court has determined that it was improper for the state to characterize a prior statement of Mr. Dubois as a lie. You are instructed that you are to disregard that portion of the state's argument.
>
> You are the sole judge of the credibility of all of the witnesses in this

10

> case. You're further admonished that the closing arguments of counsel are not evidence and are not to be considered by you as such.

*Id.* at ¶ 58.

The Court found the corrective instruction given immediately following the State's closing argument cured any prejudicial effect. *Id.* at ¶ 60. The Court also noted that there was substantial evidence of Dubois' guilt. Accordingly, the Court determined the trial court did not abuse its discretion in denying the motion for a mistrial. *Id.* at ¶ 61. The Court affirmed DuBois' conviction and sentence.

### C. Postconviction Proceedings

Dubois, represented by counsel, filed for postconviction relief. Dubois raised four claims of ineffective assistance of trial counsel and appellate counsel. Specifically, Dubois argued: (1) trial counsel provided ineffective assistance for failing to move to set aside his conviction based upon Sambenedetto's recantation of his trial testimony; (2) appellate counsel provided ineffective assistance for failing to challenge the trial court's denial of Dubois' request to proceed pro se or be appointed new counsel; (3) appellate counsel provided ineffective assistance when it failed to challenge the trial court's denial of the defense's motion in limine challenging the constitutionality of Montana's law on intoxication as a defense; (4) appellate counsel performed deficiently by failing to challenge the trial court's denial of the defense's request for the criminal records of several trial witnesses. *See e.g.*, (Doc. 10-20 at 2, ¶ 5.) Following a hearing, the district court dismissed

11

Dubois' petition. *See generally*, (Doc. 10-20.)  On appeal, the Montana Supreme

Court affirmed the dismissal of Dubois' petition. *DuBois v. State*, DA 15-0636,

2017 MT 8N, Op. (Mont. Jan. 1, 2017).

## II.    DuBois' Claims

In his present petition, DuBois alleges: (1) he received ineffective assistance

of trial counsel by trial counsel's failure to request a jury instruction on proximate

cause, which was central to the defense of the deliberate homicide charge, (Doc. 1

at 4, ¶ 13 (A)); and, 2) the State committed prosecutorial misconduct by referring

to DuBois as "a gangster" during the recross-examination of Algeo and by later

referencing a statement made by DuBois as "a lie." *Id*. at 5, ¶ 13 (B).

## III.   Analysis

The Antiterrorism and Effective Death Penalty Act of 1996 (AEDPA)

applies to Dubois' petition because it was filed after 1996.  AEDPA substantially

limits the power of federal courts to grant habeas relief to state prisoners. *Hurles v.

Ryan*, 725 F. 3d 768, 777 (9th Cir. 2014).  Under AEDPA, a federal court may not

grant a prisoner's petition on a claim that was decided on the merits in state court,

unless the state court's adjudication of the claim:

> 1) Resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or
>
> 2) Resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court

proceeding.

28 U.S.C. §2254(d).

" '[C]learly established Federal law'… is the governing legal principle or principles set forth by the Supreme Court [in its holdings] at the time the state court renders its decision." *Lockyer v. Andrade*, 538 U.S. 63, 71-71 (2003).  A state court's decision is contrary to clearly established federal law "if the state court applies a rule that contradicts the governing law set forth in [the Supreme Court's] cases" or "confronts a set of facts that are materially indistinguishable from a decision of [the] Court and nevertheless arrives at a result different from [Supreme Court] precedent." *Williams v. Taylor,* 529 U.S. 362, 405-06 (2000).  A state court's factual findings are unreasonable if "reasonable minds reviewing the record" could not agree with them.  *Brumfield v. Cain,* __ U.S. __, 135 S. Ct. 2269, 2277 (2015)(citations omitted).

"For relief to be granted, a state court merits ruling must be so lacking in justification that there was an error…beyond any possibility for fair minded disagreement." *Bemore v. Chappell*, 788 F. 3d 1151, 1160 (9th Cir. 2015). "AEDPA thus imposes a 'highly deferential standard for evaluating state-court rulings,' …and 'demands that state-court decisions be given the benefit of the doubt.'" *Renico v. Lett*, 559 U.S. 766, 773 (2010).  The standard is " 'difficult to meet,'" and a "petitioner carries the burden of proof." *Cullen v. Pinholster*, 563

13

U.S. 170, 182 (2011).

### i.    Prosecutorial Misconduct

In relation to a claim of a denial of due process resulting from prosecutorial misconduct, as both parties point out,[3] the relevant clearly established Federal law is *Darden v. Wainwright*, 477 U.S. 168 (1986), which explained that a prosecutor's improper comments will be held to violate the Constitution only if they "so infected the trial with unfairness as to make the resulting conviction a denial of due process." *Id.*, at 181 (quoting *Donnelly v. DeChristoforo*, 416 U.S. 637 (1974)).  A defendant's constitutional right to due process of law is violated if the prosecutor's misconduct renders a trial "fundamentally unfair."  *Id.* at 181-83; see also *Smith v. Phillips*, 455 U.S. 209, 219 (1982) ("[T]he touchstone of due process analysis in cases of alleged prosecutorial misconduct is the fairness of the trial, not the culpability of the prosecutor.").  Claims of prosecutorial misconduct are reviewed "on the merits, examining the entire proceedings to determine whether the prosecutor's [actions] so infected the trial with unfairness as to make the resulting conviction a denial of due process." *Johnson v. Sublett*, 63 F. 3d 926, 929 (9th Cir. 1995); see also *Greer v. Miller,* 483 U.S. 756, 765 (1987).  If there is error, harmless error analysis is applied and the error warrants relief if it "had a substantial and injurious effect or influence in determining the jury's verdict."

---

[3] *See*, (Doc. 2 at 18; Doc. 10 at 51; Doc. 12 at 8.)

*Brecht v. Abrahamson*, 507 U.S. 619, 637-38 (1993) (citation and internal quotation marks omitted).

Dubois' first claim is that the prosecutor committed misconduct during the examination of Algeo, by referencing a prior statement made by Algeo where she had described Dubois as "a gangster." Use of this word one time during the course of a ten-day trial in reference to Dubois does not rise to the level of a due process violation. There was no indication that the prosecutor intended to manipulate or misstate the evidence; "gangster" was the term that Algeo herself had used previously with investigators to describe Dubois. Moreover, there was no dispute about the assault that Dubois inflicted upon Guckeen with a baseball bat and Dubois' history of methamphetamine use and his drug seeking behavior on the day of the assault was discussed in great detail throughout the trial. Thus, there is no indication that this isolated reference to the term "gangster" made Dubois' trial "so fundamentally unfair as to deny him due process." *Donnelly*, 416 U.S. at 645; *see also, Hall v. Whitley*, 935 F. 2d 164, 165-66 (9th Cir. 1991).

In relation to the State's characterization as one of Dubois' statements as "a lie," the Court declined to grant a mistrial, but a curative instruction was timely given to the jury. (Doc. 10-12 at 118-119). The jury was instructed to disregard the State's characterization of Mr. Dubois' statement as a lie and further instructed that the closing arguments of the attorneys were not evidence. Accordingly, as

15

directed by the Supreme Court, this Court presumes that the jury disregarded the inadmissible evidence and that no due process violation occurred. *See, Greer v. Miller*, 483 U.S. 756, 766, n. 8 (1987). In light of the curative instruction, Dubois has failed to demonstrate that the isolated reference rendered his trial fundamentally unfair. *See Drayden v. White*, 232 F. 3d 704, 713 (9th Cir. 2000) (rejecting prosecutorial misconduct claim in part because the court had instructed the jury that attorneys' statements were not evidence); *Richardson v. Marsh*, 481 U.S. 200, 206 (1987) (jury is presumed to have followed the trial court's instructions).

The analysis of the Montana Supreme Court is sound and its basis for denying relief was objectively reasonable. The denial of Dubois' prosecutorial misconduct claim was not contrary to, or an unreasonable application of, clearly established Supreme Court precedent. Dubois has not met his burden under § 2254(d), accordingly, this Court must afford deference to the Montana Supreme Court decision. This claim should be denied.

### ii.    Effectiveness of Trial Counsel

The Sixth Amendment guarantees the effective assistance of counsel at trial. *Strickland v. Washington*, 466 U. S. 668 (1984). To prevail on an ineffective assistance of trial claim under *Strickland*, a petitioner must show (1) that counsel's performance was deficient, and (2) that the deficient performance prejudiced the

16

defense. *Strickland*, 466 U.S. at 687.  Both prongs of the *Strickland* test must be satisfied to establish a constitutional violation; failure to satisfy either prong requires that an ineffective assistance claim be denied. *Strickland*, at 697 (no need to address deficiency of performance if prejudice is examined first and found lacking); *Rios v. Rocha*, 299 F. 3d 796, 805 (9th Cir. 2002)("Failure to satisfy either prong of the *Strickland* test obviates the need to consider the other.").

Dubois argues that the Montana Supreme Court erred by conflating its analysis of the trial court's failure to *sua sponte* give a proximate cause instruction under plain error review with its analysis of trial counsel's alleged ineffectiveness under the prejudice prong of *Strickland*.  Based upon the consideration of the "heightened" plain error review standard, Dubois argues that the Court unreasonably applied *Strickland* and, accordingly, that the decision of the Montana Supreme Court should not be given deference under 28 U.S.C. §2254(d)(1). *See e.g.* (Doc. 2 at 14-15; Doc. 12 at 3-6.)

While the Court does not necessarily agree that the plain error standard of review is "much higher" than the *Strickland* standard, it acknowledges that the two standards are indeed different.[4]  In the same vein, the Court does not explicitly find

---

[4] The Montana Supreme Court exercises its discretion when deciding whether or not to review unpreserved claims under the common law plain error doctrine.  The doctrine is invoked sparingly.  Before the Court will find plain error, the moving party must: "(1) show that the claimed error implicates a fundamental right and (2) 'firmly convince' the Court that failure to review the claimed error would result in a manifest miscarriage of justice, leave unsettled the question of the fundamental fairness of the trial or proceedings, or compromise the integrity of

that the Montana Supreme Court's decision involved an unreasonable application

of clearly established federal law under 28 U.S.C. §2254(d), but for the sake of

argument, the Court will nonetheless independently review the merits of this claim.

### a. Counsel's Performance

To satisfy the deficient performance prong, the petitioner must prove

counsel's performance was so deficient that it "fell below an objective standard of

reasonableness." *Strickland*, 466 U.S. at 688. Judicial scrutiny of counsel's

performance "must be highly deferential," and a court must guard against the

distorting effects of hindsight and evaluate the challenged conduct from counsel's

perspective at the time in issue. *Id.* at 689; see also *Mirzayance*, 129 S. Ct. at 1420

("The proper measure of attorney performance remains simply reasonableness

under prevailing professional norms")(citations omitted); *Yarborough v. Gentry*,

540 U.S. 1, 8 (2003)(per curiam)(noting that even inadvertent, as opposed to

tactical, attorney omissions do not automatically guarantee habeas relief, because

"[t]he Sixth Amendment guarantees reasonable competence, not perfect advocacy

judged with the benefit of hindsight"); *Wiggins v. Smith*, 539 U.S. 510, 523 (2003)

(the first *Strickland* prong is a "context-dependent consideration of the challenged

conduct as seen from counsel's perspective at the time"). The Supreme Court has

advised lower courts to "indulge in a strong presumption that counsel's conduct

---

the judicial process." *State v. Daniels*, 2011 MT 278, ⁋ 32, 362 Mont. 426, 265 P. 3d 623.

falls within the wide range of reasonable professional assistance…" *Strickland* at 689.

Interestingly, Dubois previously argued in postconviction proceedings that appellate counsel provided deficient performance when he chose to raise the proximate cause instruction issue, rather than challenge the constitutionality of Montana's involuntary intoxication statute. Specifically, Dubois stated, "[s]imple legal research would have shown the question of proximate cause was more settled than the question of voluntary intoxication." (Doc. 10-21 at 30). Dubois went on:

> In a 2000 case, *State ex rel. Kuntz v. Mont. Thirteenth Judicial Dist. Ct.*, 2000 MT 22, ⁋ 37, 298 Mont. 146, 995 P. 2d 951, five years prior to appellate counsel's decision, this Court noted the plain language of Mont. Code Ann. § 45-2-201(1)(a), in addressing a question of proximate cause in a criminal case. "Conduct is the [cause] of a result if…without the conduct the result would not have occurred." Mont. Code Ann. § 45-2-102(1)(a). *See also Kuntz*, ⁋ 37. *Kuntz* went on to cite a number of authorities that proximate cause in inapplicable in criminal case[s]. The Court cited Wayne R. Lafave & Austin W. Scott, "Criminal Law," § 7.12(c) at 284 (1986) for "suggesting that the tort concepts of proximate cause are inapplicable to criminal cases, and that a more direct cause is required in criminal cases." *Id.*

> Also, and most relevant to appellate counsel's decision, the *Kuntz* Court cited and quoted *State v. Magruder*, 234 Mont. 492, 497, 765 P. 2d 716 (1988)(stating that this "Court is not able to envision a case under our present criminal code in which a proximate cause instruction would be appropriate.") *Kuntz*, ⁋ 37. In fact, this Court cited Magruder in denying the proximate cause issue in Rodney's [direct appeal]. *Dubois*, ⁋ 45.

> In *State v. Leverett*, 245 Mont. 124, 126, 799 P. 2d 119, 125 (1990), this Court specifically expressed its "disapprov[al] of the trial court's use of Instruction No. 13, a civil jury instruction on proximate cause. In drafting appropriate instruction on causation on retrial, the trial court should refer to

19

§ 45-2-201, MCA, and to Instruction No. 14 of the Montana Criminal Instructions Guide, along with the evidence presented at trial." *Id.*

(Doc. 10-21 at 31-32.)  In his postconviction reply brief, Dubois characterized the question of proximate cause under state law as a weak issue that "was settled at the time of [his] appeal." (Doc. 10-23 at 7.)

While this Court understands that Dubois was viewing the issue of proximate cause through the lens of appellate review, his citation to Montana case law certainly demonstrates that at the time of his underlying criminal proceedings, the injection of proximate cause into a criminal trial was highly disfavored under state law.  Accordingly, this Court declines to fault trial counsel for not proposing a proximate cause jury instruction.  *Strickland*, 466 U.S. at 690 ("[A] court deciding an actual ineffectiveness claim must judge the reasonableness of counsel's challenged conduct on the facts of the particular case, viewed as of the time of counsel's conduct.").  Based upon the consideration of Montana law, the Court concludes trial counsel performed adequately.

### b. Prejudice

Even though the Court need not review the prejudice prong of *Strickland*, given DuBois' failure to demonstrate deficient performance, *Rios*, 299 F. 3d at 805, DuBois likewise cannot establish prejudice.

To satisfy the prejudice prong, the petitioner "must show that there is a reasonable probability that, but for counsel's unprofessional errors, the result of the

proceedings would have been different. *Id.* at 694.  "A reasonable probability is a probability sufficient to undermine confidence in the outcome." *Id.* "The likelihood of a different result must be substantial, not just conceivable." *Richter*, 131 S. Ct. at 792. "Only those habeas petitioners who can prove under *Strickland* that they have been denied a fair trial by the gross incompetence of their attorneys will be granted the writ and will be entitled to retrial." *Kimmelman v. Morrison*, 477 U.S. 365, 382 (1986).

As stated above, trial counsel did not offer a proximate cause instruction, nor has Dubois presented such an instruction for this Court to consider.  But, it is not the absence of a proximate cause instruction that is fatal to the *Strickland* prejudice analysis, rather it was the existence of instruction 12, commonly referred to as a *Rothacher*[5] instruction, which precludes relief under this prong.

During the settling of jury instructions, the trial court proposed instruction no. 22, to which the defense objected.  The Court admitted the instruction over the defense's objection and explained its rationale:

> All right.  I spent last evening reading all of the [Rothacher] cases and – well, the [Rothacher] case and all of the subsequent cases to the [Rothacher] decision in which the Supreme Court's attempted to give us instruction as to the fact that we have several things going on for deliberate homicide.  First, you have to prove that there was a death, and then you have to prove that the defendant's acts caused the death, and [instruction] 22 is the Supreme Court's and the statutory definition of the relationship between conduct and result, and it

---

[5] *See, State v. Rothacher*, 272 Mont. 303, 313, 901 P. 2d 82, 88 (1995).

> appears to the Court it would be error not to give the instruction
> pursuant to those cases that have been addressed since [Rothacher]
> and including [Rothacher], so 22 will be given over objection.

(Doc. 10-12 at 8: 9-24.)

Ultimately, proposed instruction no. 22 was given to the Dubois' jury as

instruction 12.  The instruction mirrored Montana pattern criminal instruction 2-

111,[6] and read as follows:

> If purposely or knowingly causing death was not within the
> contemplation or purpose of the Defendant, either element can
> nevertheless be established if the result involves the same kind of
> harm or injury as contemplated but the precise harm or injury was
> different or occurred in a different way, unless the actual result is too
> remote or accidental to have a bearing on the Defendant's liability or
> on the gravity of the offense.

(Doc. 10-3 at 13.)  As stated by the trial judge, this language also followed

Montana statute § 45-5-201(2)(b).  In the comment to the pattern instruction the

Montana Jury Instruction Commission explains:

> The Montana Supreme Court decision in *Rothacher* indicates that this
> instruction should be given in any case in which causation is at issue
> as it was in *Rothacher*, a case in which the Defendant claims, through
> other witnesses, that he did not intend to cause the death of the victim;
> instead he only hit and kicked him, and his resulting death was caused
> when his head struck the ground.  The Court stated:  "…that the
> requirement of purposeful and knowing causation [for the offense of
> deliberate homicide] can occur without intending a specific result, so
> long as the same type of harm or injury was contemplated." *State v.
> Rothacher*, 272 Mont. 303, 313, 901 P. 2d 82, 88 (1995).

---

[6] The Montana pattern criminal jury instructions are available at:
https://dojmt.gov/agooffice/criminal-jury-instructions/ (accessed June 20, 2018).

22

Additionally, the jury was instructed and given a verdict form that that indicated aggravated assault was a lesser included offense of deliberate homicide. If the jury was not able to reach a verdict on deliberate homicide, they were instructed to consider aggravated assault as a lesser offense. (Doc. 10-12 at 10: 13-20; 15: 21-25; 32: 10-23.) Likewise, Dubois was charged in the alternative with attempted deliberate homicide and the jury was also instructed on this offense. *See e.g., Id.* at 11-16. In short, if the jury were to have found that the morphine administration was an intervening factor contributing to Guckeen's death, they could have found Dubois guilty of either the lesser included offense of aggravated assault or the alternative offense of attempted deliberate homicide.

As set out above, DuBois' trial counsel strenuously argued that aggravated assault was the proper charge on which to convict DuBois. It was undisputed that Dubois caused Guckeen's head injuries. *See e.g.,* Dubois' trial testimony (Doc. 10-11 at 64-67.) As Dubois has conceded, while his defense was two-fold, the defense that Guckeen may have died as a result of morphine intoxication, was stronger than his asserted self-defense. *See,* (Doc. 12 at 8.) Thus, unless the intoxication of morphine was to be believed as the main cause of Guckeen's death, all other evidence pointed directly to Dubois.

As set forth above, the treating surgeons, Dr. Fagin and Dr. Winslow, both testified to the severity of the Guckeen's injuries and offered their unequivocal

23

medical opinions that the cause of Guckeen's death was the head trauma and significant brain injury he suffered.  Likewise, the nurses treating Guckeen testified that he did not exhibit signs of a lethal morphine intoxication- his heart rate, blood pressure, breathing rate, and lack of pinpoint pupils were all inconsistent with morphine intoxication.[7]  Thus, there was good reason for a jury to believe that there was causal correlation between the three blows Dubois delivered to Guckeen's skull with a baseball bat and Guckeen's death.

What is more, Dubois' own expert, Dr. Spitz, provided testimony that did not support a proximate causation theory.  Dr. Spitz testified that Guckeen's death was "multifactorial" with several components: respiratory failure resulting from a combination of injuries to the brain and skull; respiratory depression caused from the effects of morphine intoxication; and, withdrawal of the respiratory supportive measures.  (Doc. 10-9 at 16-17.)  Also, while Dr. Spitz testified that Guckeen had intoxicating levels of morphine in his system, he also agreed that Guckeen's injuries were significant and that he may have died regardless of any treatment received.  *Id.* at 33-36, 41.  Dr. Spitz testified that blunt head trauma was the proximate cause of Guckeen's death, that is, but for the severe head and brain

---

[7] *See e.g.,* (Doc. 10-11 at 96-97)(no pinpoint pupils or shallow respiration); (Doc. 10-11 at 138)(no pinpoint pupils, low blood pressure, low heart rate, or low respiration); (Doc. 10-11 at 151-52; 55-56)(no slowing/depression of respirations and no indication of morphine intoxication).

injuries, Guckeen would not have needed any of the subsequent medical treatment. *Id.* at 42. Spitz also acknowledged there was a "definite causal link" between Guckeen being smashed in the head with a baseball bat and his ultimate death. *Id.*

Thus, the issue of causation was one for the jury to decide. As explained above, the jury was properly instructed under state law. Given the applicability of the *Rothacher* instruction to Dubois' case and the testimony presented at trial, this Court is hard-pressed to see how the inclusion of a proximate cause instruction, the exact language of which is still unknown,[8] would have altered the trial outcome. Dubois has not shown a reasonable probability that the result of the proceeding would have been different. *Strickland*, 466 U.S. at 694. Accordingly, this claim should be denied.

## IV.   Certificate of Appealability

"The district court must issue or deny a certificate of appealability when it enters a final order adverse to the applicant." Rule 11(a), Rules Governing § 2254 Proceedings. A COA should issue as to those claims on which the petitioner makes "a substantial showing of the denial of a constitutional right." 28 U.S.C. § 2253(c)(2). The standard is satisfied if "jurists of reason could disagree with the

---

[8] Even in jurisdictions where proximate cause instructions have been given in criminal cases, circuit courts and state courts alike have required a defendant to demonstrate that extraordinary medical negligence was the sole cause of death in order to break the causation chain. *See e.g. U.S. v. Rodriguez*, 766 F.3d 970, 981-984 (9th Cir. 2014)(collecting cases). Dubois has made no such showing.

district court's resolution of [the] constitutional claims" or "conclude the issues presented are adequate to deserve encouragement to proceed further." *Miller-El v. Cockrell*, 537 U.S. 322, 327 (2003) (citing *Slack v. McDaniel*, 529 U.S. 473, 484 (2000)).

Dubois has not made a substantial showing that he was deprived of a constitutional right.  His claim of prosecutorial misconduct does not survive deferential review under 28 U.S.C. §2254(d) and Dubois is unable to establish either prong of the *Strickland* standard to demonstrate that he received ineffective assistance of counsel.  Thus, Dubois' petition is lacking in merit.  There are no close questions and there is no reason to encourage further proceedings.  A certificate of appealability should be denied.

Based on the foregoing, the Court enters the following:

## RECOMMENDATION

1.  Mr. Dubois' prosecutorial misconduct claim should be denied because it does not survive deferential review under AEDPA.

2.  Mr. Dubois' ineffective assistance of counsel claim should be denied on the merits.

3.  The Clerk of Court should be directed to enter a judgment in favor of Respondents and against Petitioner.

## NOTICE OF RIGHT TO OBJECT
## TO FINDINGS & RECOMMENDATION
## AND CONSEQUENCES OF FAILURE TO OBJECT

Mr. DuBois may object to this Findings and Recommendation within 14 days. 28 U.S.C. § 636(b)(1). Failure to timely file written objections may bar a de novo determination by the district judge and/or waive the right to appeal.

DATED this 24th day of July, 2018.

/s/ John Johnston
John Johnston
United States Magistrate Judge